# UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF COLORADO

| | |
|---|---|
| In re: ) | |
| ) | Case No. 12-27312 SBB |
| KEVIN RAY SMITH, ) | Chapter 7 |
| ) | |
| Debtor. ) | |
| ) | |
| ) | |
| JARED WALTERS, ) | Adversary Proceeding No. 14-01065 SBB |
| Chapter 7 Trustee, ) | |
| ) | |
| Plaintiff, ) | |
| v. ) | |
| ) | |
| FARMERS KORNER, INC. ) | |
| ) | |
| Defendant. ) | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW AND ORDER

THIS MATTER comes before the Court on the Complaint filed by Plaintiff Jared Walters, Chapter 7 trustee (the "Trustee") and the Amended Answer filed by Defendant Farmers Korner, Inc. ("Farmers Korner"). Trial in this adversary proceeding was held on June 18, 2014. The Court, having reviewed the pleadings and considered the testimony, exhibits, arguments of counsel, and legal authority cited by the parties, makes the following findings of fact and conclusions of law in favor of the Trustee and against Farmers Korner.

### I. JURISDICTION

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334(b) and (e) and this is a core proceeding under 28 U.S.C. §§ 157(b)(2)(A) and (F) as it involves the administration of the underlying bankruptcy estate and proceedings to determine, avoid or recover preferences.

## II. PROCEDURAL BACKGROUND

The Trustee commenced this adversary proceeding by filing his Complaint against Farmers Korner seeking, among other relief, to avoid under 11 U.S.C. § 547(b)[1] certain transfers of motor vehicles and trailers made by Debtor Kevin Ray Smith (the "Debtor") to Farmers Korner between ninety days and one year before the date Debtor filed his petition.

On December 29, 2014, the Trustee and Farmers Korner (together the "Parties") submitted to the Court a Joint Pretrial Statement (the "Joint Pretrial Statement").[2] The matter was tried to the Court on June 18, 2014.

At trial, the Parties stipulated to the admission of Trustee's Exhibits 1-26, 29, 31 and 34-37, and Farmers Korner's Exhibits A-S. Trustee's Exhibits 28, 30 and 32 were not stipulated to but were offered and admitted into evidence. Farmers Korner's Exhibits T-W were not stipulated to but were offered and admitted into evidence. Consequently, all of the Trustee's and Farmers Korner's exhibits were admitted into evidence except for Trustee's Exhibits 27 and 33, which were not offered into evidence.

## III. FINDINGS OF FACT

Many of the following facts were stipulated to by the Parties in their Joint Pretrial Statement. In large part, the Stipulated facts are identified by reference to the numbered paragraphs found in the Statement of Stipulated and Uncontested Facts ("Statement of Stipulated Facts") set forth in the Joint Pretrial Statement, which Statement of Stipulated Facts is adopted by the Court in its entirety. Other factual findings are based upon exhibits admitted and/or witness testimony provided at trial.

### Background

1. On August 17, 2012, Debtor filed for relief under Chapter 7 of the Bankruptcy Code (the "Petition Date").[3] Debtor resides at 252 Red Rim Drive, Grand Junction, Colorado 81507 and works full time in Kennewick, Washington.[4]

2. Trustee is the duly appointed Chapter 7 Trustee of the bankruptcy estate of Debtor, Case No. 12-27312 SBB.[5]

3. Farmers Korner is a Colorado corporation. At all times relevant, Laurence E. Smith ("Mr. Smith") has been and is the sole shareholder and person in control of Farmers Korner. The Debtor has never been a shareholder, officer or director of Farmers Korner.[6] The

---

[1] Unless otherwise noted, all statutory references shall be to Title 11 of the United States Code.
[2] *See* Docket No. 26.
[3] Statement of Stipulated Facts ¶ 6.
[4] Exhibit 1; Testimony of Debtor.
[5] Statement of Stipulated Facts ¶ 1.
[6] *Id.* at ¶¶ 2-4.

primary business of Famers Korner is the operation of a convenience store.[7] Farmers Korner's is not in the business of lending money.[8]

    4.    Mr. Smith is Debtor's father.[9]

    5.    At all relevant times, Debtor was the sole owner of Kevin's Performance Center, Inc. d.b.a. Performance Pools and Spas ("KPC").[10] KPC operates as Performance Pools and Spas.[11] Debtor has been the only shareholder of KPC and Mr. Smith has never been a shareholder, officer or director of KPC.[12] KPC's primary business consisted of sales, service and installation of pools and spas.[13] KPC maintained a storefront at 2575 Highway 6 and 50, Grand Junction, Colorado 81501.[14] KPC maintained a storage lot at 202 Grant Road, Grand Junction, Colorado 81507.[15] KPC ceased operations approximately March 1, 2012, prior to the Petition Date.[16]

### The Promissory Note

    6.    On or about December 27, 2007, Farmers Korner executed a promissory note payable to Alpine Bank in the original principal amount of $126,056.60 (the "2007 Note").[17] Farmers Korner then executed another promissory note on or about February 10, 2009 payable to Alpine Bank in the original principal amount of $50,000 (the "2009 Note).[18]

    7.    Around 2009, the Debtor needed financing for his business KPC, but was unable to obtain floor plan financing for KPC through traditional means due to the downturn of the economy, restrictive lending requirements, and other factors.[19] Accordingly, Debtor approached his father, Mr. Smith, for financing.[20] To finance operations of KPC, on or about December 2, 2009, the parties entered into what is titled a "Secured Promissory Note" by and between "Kevin Ray Smith d.b.a Performance Pools and Spas" as the borrower-obligor and "Farmer's Korner, Inc. and Laurence Smith" as the lender-payees, in the original principal amount of $100,000.00 (the "Promissory Note").[21]

    8.    The testimony from Mr. Smith is not entirely clear, but it appears draws were made on Farmers Korner's lines of credit represented by the 2007 Note and 2009 Note and those

---

[7] *Id.*
[8] Testimony of Mr. Smith.
[9] Statement of Stipulated Facts ¶ 5.
[10] *Id.* at ¶ 10.
[11] Testimony of Debtor.
[12] Testimony of Debtor and Mr. Smith.
[13] Testimony of Debtor.
[14] *Id.*
[15] *Id.*
[16] *Id.*; *See also* Exhibit 1, response to SOFA Question 18; *See* Exhibits 11-22.
[17] Exhibit 3.
[18] Exhibit 4.
[19] Testimony of Debtor.
[20] *Id.*
[21] Exhibit 5.

draws acted as advances and consideration for the Promissory Note.[22]

9. The Promissory Note provides that it was to be secured by all owned and after-acquired inventory and equipment of KPC and Debtor pursuant to a separate security agreement and U.C.C. filing.[23] On December 8, 2009, a UCC Financing Statement was filed with the Colorado Secretary of State reflecting a lien held by Farmers Korner's on "any and all equipment and inventory now owned or hereinafter acquired" belonging to KPC and the Debtor.[24]

10. However, Farmers Korner's security interests were not notated on the Certificates of Title for the vehicles and trailers at issue here, and Farmers Korner has never made application to the Colorado Department of Revenue to have its lien notated on the respective Certificates of Title pursuant to the Promissory Note.[25]

11. Therefore, notwithstanding the fact that the Promissory Note was titled as "Secured" by the parties, Farmers Kroner did not have a perfected lien on motor vehicles of the Debtor or KPC.[26]

12. The Promissory Note was payable on demand and on December 2, 2011, Farmers Korner, through its counsel, mailed a letter to the Debtor, "Kevin Ray Smith d/b/a Performance Pools and Spas," notifying Mr. Smith that, on default, Farmers Korner was accelerating the amounts due and owing under the Promissory Note and demanding payment in full of the balance of the Promissory Note.[27] As of December 2, 2011, the total amount owed under the Promissory Note was $112,750.00 with interest accruing at 4.25% per annum.[28]

Enforcement of the Promissory Note

13. To enforce the Promissory Note, on January 30, 2012, Farmers Korner filed an action styled, *Farmers Korner, Inc. v. Kevin R. Smith*, case number 2012CV34, in the District Court for Summit County, Colorado (the "Lawsuit").[29] Debtor was the only defendant to the Lawsuit and KPC was neither a defendant nor a party.[30]

14. One day later, on January 31, 2012, Debtor waived service of the Summons and

---

[22] Testimony of Mr. Smith.
[23] Exhibit 5, ¶ 4.
[24] Exhibit 6.
[25] *See* Exhibits 10, 13, 15, 17, 19 and 2; Testimony of Mr. Smith.
[26] Pursuant to Colo. Rev. Stat. § 42-6-120, also known as the "Colorado Certificate of Title Act" or "the CCTA,"
>   . . . [a] mortgage or refinancing of a mortgage intended by the parties to the mortgage or refinancing to encumber or create a lien on a motor vehicle, or to be perfected as a valid lien against the rights of third persons, purchasers for value without notice, mortgagees, or creditors of the owner, *must be filed for public record.* The department or authorized agent shall note the fact of filing *on the owner's certificate of title* or bill of sale substantially in the manner provided in section 42-6-121. C.R.S. § 42-6-120(1) (emphasis added)
[27] Exhibit 7.
[28] *Id.*
[29] Statement of Stipulated Facts ¶ 11.
[30] *See* Exhibit 8.

Complaint filed in the Lawsuit and confessed judgment in the amount of $112,750 plus interest to accrue at 18% per annum, costs and attorney's fees (the "Judgment").[31] Judgment was entered in favor of Farmers Kroner against the Debtor on February 26, 2012.[32]

15. Five days after the Debtor waived service and confessed judgment, in a letter dated February 5, 2012 addressed to Farmers Korner and signed by Debtor, the Debtor listed numerous assets that he desired to turnover to Farmers Korner in satisfaction of the Judgment (the "February 5 Letter").[33] In the February 5 Letter, Debtor stated that the various assets to be turned over to Farmers Kroner belonged to him, individually, and also to KPC.[34] In the February 5 Letter, the Debtor attributed specific values to the assets to be turned over and Farmers Korner seemingly accepted those values as fair and reasonable.[35] While a number of assets were transferred to Farmers Korner in connection with Judgment and the February 5 Letter, only the following six assets are subject to the Trustee's claims[36]:

    a. 2007 Dodge, VIN 3D7MX48C87G720659 (the "Dodge") valued at $20,000. The Certificate of Title indicates that Debtor and KPC jointly owned the Dodge[37];

    b. 2003 Harley Davidson motorcycle, VIN 1HD1FCW133Y615456 (the "Motorcycle") values at $8,400. The Certificate of Title indicates that Debtor solely owned the Motorcycle[38];

    c. 2001 GMC, VIN 1GDHG31R711134508 (the "GMC") valued at $3,800. The Certificate of Title indicates that the Debtor solely owned the GMC[39];

    d. 2005 Chrysler, VIN 1C4GP45R35B378396 (the "Chrysler") valued at 4,000. The Certificate of Title indicates that the Debtor solely owned the Chrysler[40];

    e. 1996 Spa trailer, VIN 4MKD11116TH000316 (the "Spa Trailer") valued at $1,000. The Certificate of Title indicates that the Debtor solely owned the Spa Trailer[41]; and

    f. 2004 Max trailer, VIN 5GXCF20284M001749 (the "Max Trailer") valued at $1,250. The Certificate of Title indicates that the Debtor solely owned the

---

[31] Statement of Stipulated Facts ¶ 12; Exhibit 8.
[32] Statement of Stipulated Facts ¶ 12.
[33] Exhibit 9.
[34] *See* Exhibit 9.
[35] Exhibit 9; Testimony of Mr. Smith; Statement of Stipulated Facts ¶¶ 13-18.
[36] Exhibits 9, 10, 13, 15, 17, 19 and 21.
[37] Exhibit 10.
[38] Exhibit 13.
[39] Exhibit 15.
[40] Exhibit 17.
[41] Exhibit 19.

Max Trailer[42].

16. The Dodge, the Motorcycle, the GMC, the Chrysler, the Spa Trailer and the Max Trailer are collectively referred to as the "Vehicles."

17. With the exception of the Spa Trailer, which was used exclusively for business purposes, Debtor used the Vehicles for both business and personal purposes.[43]

18. Debtor's personal residential address, rather than the address of KPC, was listed on the Certificates of Title for the Motorcycle and the Chrysler.[44] Business addresses were listed on the Certificates of Title for the Spa Trailer and Max Trailer.[45] Lenders' (not Farmers Korner) addresses were listed on the Certificates of Title for the Dodge and GMC because it appears that even though the liens were paid in full and the original Certificates of Title had been returned to Debtor, and Debtor had not applied for new titles prior to transferring the Dodge and GMC to Farmers Korner.[46]

19. On March 1, 2012, Debtor assigned the Vehicles to Farmers Korner in partial satisfaction of the Judgment.[47]

20. The same day, on March 1, 2012, Farmers Korner applied for new Certificates of Title for each of the Vehicles.[48] In each application, Farmers Korner denominated a purchase price that corresponded with the value attributed to the Vehicles in the February 5 Letter (*e.g.* $20,000 for Dodge, $8,400 for the Motorcycle, etc.).[49] Farmers Korner used the 202 Grant address (KPC's storage lot) as its address for each of the Vehicles.[50]

21. On or about April 6, 2013, Farmers Korner sold the Chrysler to a third-party in an arm's length transaction for $3,200.[51]

22. On or about April 7, 2014, Farmers Korner sold the GMC to a third-party in an arm's length transaction for $3,500.[52]

23. Shortly after the Debtor assigned the Vehicles to Farmers Korner, the remaining four Vehicles were transported to a lot in Kennewick, Washington.[53] The Debtor works at the Kennewick lot and exercises control over the Vehicles at the direction of Mr. Smith.[54] Mr.

---

[42] Exhibit 21.
[43] Testimony of Debtor.
[44] Exhibits 13 and 17.
[45] Exhibits 19 and 20.
[46] Exhibits 10 and 17.
[47] Statement of Stipulated Facts ¶¶ 13-17.
[48] Exhibits 12, 14, 16, 18, 20, 22.
[49] *Id.*
[50] *Id.*
[51] Statement of Stipulated Facts ¶ 19; Testimony of Mr. Smith.
[52] Statement of Stipulated Facts ¶ 20; Testimony of Mr. Smith.
[53] Testimony of Debtor.
[54] Testimony of Mr. Smith; Testimony of Debtor.

Smith has assigned Debtor with the task of the selling the remaining unsold Vehicles.[55]

Communications Surrounding Enforcement of the Promissory Note

24.     In January through March of 2012, the months leading up to the Debtor transferring the Vehicles to Farmers Korner, the Debtor, Mr. Smith and Famers Korner's counsel Ronald Carlson exchanged numerous emails concerning enforcement of the Promissory Note and the turnover of the Vehicles, among other assets.[56]

25.     On January 30, 2012, Mr. Smith sent an email to the Debtor outlining a plan to sell KPC's assets, including the Vehicles, and suggesting that KPC's assets be transferred into a new entity controlled by Farmers Korner that would then liquidate the assets.[57] The name of the new entity was suggested to be Pro Pools and Spas.[58] In his email, Mr. Smith remarked that the Debtor should not "appear as an officer or stock holder" of Pro Pools and Spas but could be General Manager to avoid any conflicts.[59] According to the testimony of Mr. Smith and the Debtor, the proposed plan of forming a separate company in the name of Pro Pools and Spas to liquidate KPC's assets was never realized. However, the Debtor disclosed Pro Pools and Spas as his employer on Schedule I of his bankruptcy petition and reflected receiving earning therefrom in the amount of $4,333.33 per month.[60] Moreover, Pro Pools and Spas carried a checking account and deposits were made into that checking account from the proceeds of the sale of the Chrysler on April 26, 2013.[61]

26.     It also appears that Mr. Smith had a hand in drafting and revising the February 5 Letter that the Debtor sent to Farmers Kroner offering to turn over the Vehicles and other assets in satisfaction of the Judgment. Specifically, at some point prior to the February 5 Letter being sent, Mr. Smith emailed the Debtor with suggested revisions that appear to have been incorporated into the February 5 Letter. [62]

27.     Furthermore, also around February 2012 (the exact date is undiscernible), Mr. Smith emailed the Debtor with instructions with what to do with the Vehicles' Certificates of

---

[55] *Id.*
[56] Exhibits 29, 30, 31, 32 and 34.
[57] Exhibit 29.
[58] *Id.*
[59] *Id.*
[60] Testimony of Mr. Smith; Exhibit 2; *see* Exhibit 29.
[61] Exhibits 1 and 23.
[62] Exhibits 30 and 32. The changes suggested by Mr. Smith appear on an email dated February 15, 2012. Neither the Debtor nor Mr. Smith were able to explain how changes suggested on an email dated February 15, 2012 were incorporated and sent in an email dated February 5, 2015. While the February 15, 2012 email postdates the February 5 Letter, it seems that the February 5 Letter, despite it being dated February 5, 2012, was actually sent at some later time. First, the Court notes that a draft of the February 5 Letter appears in another email dated February 7, 2012 (Exhibit 30), but in which email the date of the February 5 Letter is not updated to reflect the later date of February 7, 2012, instead the draft remains dated as of February 5, 2012. Second, the Court finds that that some of the changes suggested by Mr. Smith in the February 15, 2012 email (Exhibit 32) seemingly were incorporated in the February 5 Letter. It logically follows, therefore, that the February 5 Letter was actually sent sometime after the drafts of February 7 and 15, 2012 had been circulated, but that the date of the letter was never updated from February 5, 2012 before being sent out.

-7-

Title.[63] In the email, Mr. Smith suggested that the Debtor could liquidate the Vehicles on behalf of Farmers Korner, but that the Debtor should get advice from Farmers Korner's counsel Mr. Carlson and should be "extremely careful so that [they] do not get sued for fraud."[64]

28.     On March 9, 2012, Mr. Carlson emailed the Debtor, presumably in response to a question regarding the transfer of the Vehicles,[65] in which email, Mr. Carlson remarked, as follows: "Looks OK; If you file formal bankruptcy it may not hold up; anything regardless of legal form done within 1 year filing bankruptcy can be set aside if the Court finds it a 'preference' but you have legit cover."[66]

## IV. CONCLUSIONS OF LAW

### 1. The Parties' Claims and Defenses

The Trustee has sought to avoid the Debtor's transfer of the Vehicles to Farmers Korner (the "Transfers") pursuant to § 547(b) and recover either the transferred Vehicles or the value thereof under § 550(a). In the parties' Joint Pretrial Statement and during trial, the dispute was limited to the following two issues (1) whether Farmers Korner is a non-statutory insider under § 101(31); and (2) whether Debtor only had a bare legal title interest in the Vehicles. The parties agree that all other elements of § 547(b) have been met by the Trustee. Accordingly, these conclusions of law will only address the two disputed issues.

### 2. Farmers Korner is a Non-statutory Insider

Section 101(31) provides that the "term 'insider' *includes* [,] . . . if the debtor is an individual[,] . . . (i) relative of the debtor or of a general partner of the debtor" along with a list of three more examples of "insiders."[67] The Bankruptcy Code's use of the term "includes" means the list is not limiting. Rather, the term "insider" is inclusive and is defined by way of examples.[68] The Tenth Circuit has adopted this example-based approach when evaluating an entity's status as an insider.[69] When the relationship between the debtor and creditor is so close that they are not dealing at arm's length, then the creditor is given insider status.[70] Therefore, although Farmers Korner is not an entity explicitly defined as an insider in § 101(31), this does not preclude Farmers Korner from being an insider because the list is not exclusive. Rather, for the reasons set forth below, the Court finds that the nature of the relationship between the Debtor and Farmer Kroner, and the various dealings between them, conclusively establish that Farmer Kroner operated as an insider of the Debtor.

---

[63] Exhibit 31.
[64] *Id.*
[65] Exhibit 34.
[66] *Id.*
[67] 11 U.S.C. § 101(31)(A) (emphasis added).
[68] *See In re Barman*, 237 B.R. 342, 348 (Bankr. E.D. Mich. 1999).
[69] *In re U.S. Medical, Inc.*, 531 F.3d 1272, 1279-1280 (10th Cir. 2008); *In re Kunz*, 480 F.3d 1072, 1079 (10th Cir. 2007).
[70] *Id.*

Initially, this Court finds that the cases cited by Farmers Korner in support of the argument that is not an insider, i.e., *In re U.S. Medical, Inc.*[71] and *In re Kunz*,[72] do not, in fact, advance its position. In *U.S. Medical, Inc.*, a creditor that had a 10.6% interest in the debtor and a right to appoint its representative to debtor's board of directors was not treated as an insider because the creditor had abstained from voting on transactions concerning payments to it and otherwise exhibited sensitivity to potential conflicts of interest.[73] Likewise, in *Kunz*, the creditor at issue was a Director Emeritus that did not attend board of director meetings, was not entitled to attend those meetings and had no voting rights or other authority.[74]

Unlike the creditors in *U.S. Medical, Inc.* and *Kunz* who either abstained from dealing with the debtor or had no authority over the debtor, Farmers Korner exerted considerable control and influence over the Debtor in this case. In fact, the level of control and influence exercised by Farmers Kroner, and particularly Mr. Smith, over the Debtor here is extraordinary, if not unprecedented, in routine creditor-debtor arm's length dealings. The uniqueness of the following facts make for compelling evidence that the Transfers were not done at arm's length:

1. Debtor remains in possession and control of the Vehicles almost three and half years after the Transfers. It is highly unusual that a debtor would retain possession of collateral after it had been turned over to the creditor. This is not indicative of an arm's length relationship;

2. Debtor has been tasked with selling the Vehicles at Mr. Smith's direction. Again, it is highly unusual that a creditor would allow a debtor to keep, hold, and sell collateral after the collateral has been turned over to the creditor except in circumstances that are not present here. This is not indicative of an arm's length relationship;

3. It was Mr. Smith's idea to set up a separate entity, Pro Pools and Spas, into which Debtor would transfer the Vehicles and then the Debtor would act as the General Manager of that entity to sell the Vehicles. Concerning to the Court is that Debtor and Mr. Smith testified that Pro Pools and Spas never materialized, yet the Debtor listed Pro Pools and Spas on his Schedule I as his employer with substantial monthly income and the proceeds from the sale of the Chrysler were deposited into a Pro Pools and Spas' checking account. Not only do these inconsistencies call into question the veracity of Mr. Smith and Debtor, but this is a highly unusual arrangement that is not indicative of an arm's length transaction;

4. Mr. Smith had a hand in drafting the February 5 Letter. In normal arm's length transactions, creditors do not ordinarily assist debtors in drafting correspondence to themselves;

---

[71] 531 F.3d at 1279-1280.
[72] 480 F.3d at 1079.
[73] *In re U.S. Medical, Inc.*, 531 F.3d at 1278.
[74] *In re Kunz*, 480 F.3d at 1078.

5. Mr. Smith remarked to the Debtor in an email that they should be very careful in how they liquidate the Vehicles to avoid being sued for fraud. The remark demonstrates that the parties' were aware that the transaction was not being conducted at arm's length, and therefore, needed to take precautionary measures to avoid claims such as the Trustee's;

6. Mr. Smith directed the Debtor to Mr. Carlson to seek legal advice. Creditors in arm's length transactions do not direct debtors to consult with or get legal advice from creditor's counsel;

7. Debtor confessed judgment at a higher interest accruing at 18% per annum, even though Farmers Korner's demand letter indicated that interest was accruing at 4.25% per annum and there is nothing in the Promissory Note justifying an 18% interest rate. Confessing judgment was likely warranted because the Debtor did not dispute the debt. However, it is remarkable that the Debtor would not at least question the interest rate. Instead, the Debtor seemingly signed whatever his father gave to him without question;

8. Farmers Korner's address on the Certificates of Title is KPC's storage lot. Creditors in arm's length transactions do not normally adopt or use debtors' addresses; and

9. Underlying each of these facts is Debtor's and Mr. Smith's relationship as father and son. While Debtor should not be faulted for wanting to help his father recover collateral (or vice-versa, a father wanting to help his son finance a business), the parties' relationship and conduct in this case is not a badge of an arm's length transaction and the parties may not be allowed to engage in such conduct to the detriment of Debtor's other creditors.

Moreover, the Court notes that the term "insider" includes a relative of the Debtor.[75] Here, Mr. Smith is Debtor's father and Mr. Smith is a payee of the Promissory Note along with Farmers Korner. Although Mr. Smith was not a plaintiff to the Lawsuit and the Vehicles were transferred to Farmers Korner and not specifically Mr. Smith, the reality of the situation here is that Mr. Smith controlled Farmers Kroner, directly benefitted from the Transfers as a payee on the Promissory Note, and indirectly benefitted financially as being the sole shareholder of Farmers Korner.

It appears that Mr. Smith and Debtor attempted to legitimatize the transaction by having Mr. Carlson mail a demand letter to the Debtor, by filing the Lawsuit, and with Debtor's February 5 Letter. However, scratching the surface of Mr. Smith and Debtor's dealings quickly reveals that there was nothing arm's length about the transfers of the Vehicles. It was a concerted, coordinated, and organized effort where Mr. Smith and Debtor worked closely, along with the assistance of Mr. Carlson, to structure a transaction that would give them "legit cover" against the Trustee's claims in light of Debtor's imminent bankruptcy. It was a well choreographed transaction, crafted by the creditor-father, Mr. Smith, and his attorney, Mr.

---

[75] 11 U.S.C. § 101(31)(A).

Carlson. Due to the closeness of the relationship and the lack of arm's length dealings, it is clear to this Court that Farmers Korner is an insider to Debtor.

### 3. The Vehicles are Property of the Estate

"For the purposes of most bankruptcy proceedings, property interests are created and defined by state law."[76]  Pursuant to C.R.S. § 42-6-107, a Certificate of Title shall be *prima facie* evidence of the matters contained therein.[77]

Here, the Debtor alone remains the title owner of all Vehicles, except the 2007 Dodge, which the Debtor remains the title owner along with KPC.

The presumption of ownership set forth in C.R.S. § 42-6-107 may be overcome in very limited circumstances. For instance, in a previous case before this Court, in *In re Garberding*, a Mercedes Benz was titled in debtor's name, but the debtor's boyfriend was the sole user of the vehicle. The Chapter 7 trustee asserted that the Mercedes was property of the estate because it was titled in debtor's name. However, this Court ruled that the boyfriend overcame the presumption in C.R.S. § 42-6-107 because it was the boyfriend, and not the debtor, who made all the car payments, paid for insurance and maintenance, and was the exclusive driver and equitable owner of the vehicle.[78]  This Court remarked that in this "*rare* instance, because of the Debtor's *absence* of actual ownership interest in the Mercedes, the Mercedes is not property of the . . . estate."[79]  Following *Garberding*, another Judge of this District, Honorable Michael E. Romero, in *In re Viveros* similarly denied a Chapter 7 trustee's motion for turnover of a Lexus where the non-debtor who was not on the title of the car was, in fact, the individual to make the car payments; maintain insurance; and possess and drive the car in California while debtor lived in Colorado.[80]  Judge Romero concluded that under the facts of the case, the non-debtor was the equitable and true owner of the car, notwithstanding a lack of title ownership. Accordingly, if Farmers Korner cannot overcome the presumption, then the Vehicles are property of the estate under § 541(a) because they are titled in Debtor's name.[81]

Farmers Kroner argues that under *Garberding* and *Viveros*, KPC, and not the Debtor, was the true owner of the Vehicles. However, the Debtor's testimony at trial was that he exercised control and use of the Vehicles, including the 2007 Dodge, in a manner that is inconsistent with the parties in *Garberding* and *Viveros*. Furthermore, the Debtor treated the Vehicles as his personal property when he made the Transfers to satisfy a personal debt. Debtor was the only defendant in the Lawsuit.  KPC was not a defendant. Therefore, the Debtor turned over the Vehicles in partial satisfaction of the Judgment entered solely against him.  It is inapposite for Debtor to use property titled in his name to satisfy a personal debt, and then to turn around and argue that the Vehicles were property of KPC to protect his father's interest.

---

[76] *In re Garberding*, 338 B.R. 463, 467 (Bankr. D. Colo. 2005) (internal quotations and citations omitted).
[77] C.R.S. § 42-6-107; *In re Garberding*, 338 B.R. at 467.
[78] *In re Garberding*, 338 B.R. at 469.
[79] *Id.* (emphasis in original).
[80] *In re Viveros*, 456 B.R. 531-532 (Bankr. D. Colo. 2011, Judge Romero).
[81] Exhibits 10, 13, 15, 17, 19 and 21.

Moreover, the Debtor admitted in his February 5 Letter that some of the property being turned over to Farmers Korner was his individual, personal property. There is no indication in the February 5 Letter that any of the property turned over, which included the Vehicles, was the exclusive property of KPC. It is disingenuous for the Debtor to regard Vehicles as his individual property in the February 5 Letter, turn them over to satisfy his personal debt, and then change his position after his father's company is sued by the Trustee. Likewise, Mr. Smith, who commenced the Lawsuit; had a hand in drafting the February 5 Letter; orchestrated the Transfers to Farmers Kroner; and accepted said Transfers to satisfy Debtor's personal liability under the Promissory Note, may not now credibly argue that the Vehicles were property of KPC. The disingenuousness of this argument is underscored by the posture of the Lawsuit. If the Vehicles were KPC's assets, then KPC should have also been a defendant in the Lawsuit. Yet, insofar as this Court is advised the issue of equitable ownership of the Vehicles by KPC never came up during the Debtor's negotiations with Farmers Kroner to satisfy the personal Judgment against him.

Therefore, despite Debtor testifying that the Vehicles were used by KPC and that KPC made all the monthly installment payments on the Vehicles, there are numerous other factors that outweigh these considerations. Unlike the parties in *Garberding* and *Viveros* that had exclusive use and possession of the vehicles, Debtor testified that he, as the title owner, and not KPC, used the Vehicles (with the exception of the Spa Trailer) for both business and personal uses. Even though the Spa Trailer was used solely for business purposes, as discussed above, this is insufficient to overcome the presumption in light of the other facts and circumstances of this case. While Debtor's personal use of the Vehicles may have been less than KPC's use of the Vehicles, it was personal use nonetheless. Further, the business use of the Vehicles prior to their transfer is overshadowed by their ultimate disposition, namely the transfer of the Vehicles by the Debtor (not KPC) to satisfy a debt of the Debtor (not KPC). It is also noteworthy to consider the fact that around the same time that the Debtor made the Transfers to Farmers Kroner, KPC ceased its operations. There was no evidence presented regarding steps taken by KPC, if any, to dissolve the company and liquidate the assets, including the Vehicles. Therefore, an inference maybe drawn that at the time of the Transfers, all parties, including KPC and its creditors, did not consider the Vehicles to be property of KPC.

Finally, the Court finds that Farmers Korner likely lacks standing to make an argument of equitable ownership on behalf of KPC. Notably, in both *Garberding* and *Viveros*, it were the parties asserting ownership who argued that the vehicles were not property of the estate. Therefore, it is KPC, as the alleged owner of the Vehicles, that has standing to argue that the Vehicles were its property. KPC certainly knew of this proceeding because its sole shareholder, Debtor, testified at the trial. At no time did KPC intervene to protect its interests.

This case does not present itself as one of the "rare instances" where the entity using the motor vehicle is completely divorced from the entity in which the motor vehicle is titled.[82] Since Debtor clearly had full control over the disposition of the Vehicles in his individual capacity to satisfy his personal debts, and not as a member of KPC. Since the Vehicles are titled in Debtor's name, the Vehicles are property of the estate under § 541(a). The Court concludes that Farmers Korner has not overcome the presumption of ownership.

---

[82] *In re Garberding*, 338 B.R. at 469.

## V. ORDER

Based upon the above and foregoing,

IT IS HEREBY ORDERED that the Trustee's Claim for Relief is **GRANTED**. The transfers of the Vehicles from Debtor to Farmers Korner are hereby avoided under 11 U.S.C. § 547(b) and the Trustee may recover the avoided Transfers, or the value thereof, under 11 U.S.C. § 550(a). Consistent with 11 U.S.C. § 550(a) Debtor's transfers to Farmers Korner of the following vehicles and trailers are hereby avoided: (1) Debtor's one-half interest in the Dodge; (2) the Motorcycle; (3) the Spa Trailer; and (4) the Max Trailer. Additionally, since Farmers Korner sold the GMC and Chrysler, judgment shall enter in favor of Trustee and against Farmers Korner for the total amount of $7,800.00.[83]

IT IS FURTHER ORDERED that all issues in the within adversary case having been concluded, the Clerk may close the case upon the herein order becoming final and non-appealable.

Dated this 31st day of July, 2015.

BY THE COURT:

_____
The Honorable Sidney B. Brooks
United States Bankruptcy Judge

---

[83] The value of the GMC is $4,000 and the value of the Chrysler is $3,800. Farmers Korner never disputed these values and used these values as the "purchase price" when applying for new Certificates of Title.